[Cite as *Braidy v. Braidy*, 2013-Ohio-5304.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

ANTHONY E. BRAIDY

      Appellant/Cross-Appellee

      v.

ROULA Y. BRAIDY

      Appellee/Cross-Appellant

C.A. No.     26608

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    2008-10-3026

DECISION AND JOURNAL ENTRY

Dated: December 4, 2013

WHITMORE, Judge.

{¶1} Appellant/Cross-Appellee, Anthony Braidy ("Husband"), appeals from the judgment of the Summit County Court of Common Pleas, Domestic Relations Division. Appellee/Cross-Appellant, Roula Braidy ("Wife"), cross-appeals from the same judgment. This Court affirms in part and reverses in part.

I

{¶2} Husband and Wife were married on August 26, 2001, in Zahle, Lebanon. They were married in a joint ceremony with Husband's brother marrying Wife's sister. Husband returned to the United States shortly after the wedding. Wife followed approximately six months later after she obtained the necessary paperwork to enter the country. Husband and Wife had three children before filing for divorce on October 2, 2008. About the same time Husband filed for divorce, his brother also filed for divorce in Arizona.

{¶3} Husband, his brother, and their mother own and operate Braidy Jewelers. Husband owns 40% of the business. In 2006, Husband paid cash for a home in Arizona. He testified that some of the funds were personal, but that most were loans from various sources. Shortly after purchasing the property, Husband transferred the deed to his brother. His brother then mortgaged the property and used the proceeds to open a Braidy Jewelry store in Arizona.

{¶4} In addition to the jewelry business, Husband testified that he managed several rental properties in the Akron area for his mother. Husband's accountant testified that while Husband did not own the properties, he was entitled to, and did, take certain tax deductions.

{¶5} In March 2009, the court issued a temporary support order requiring Husband to pay Wife $2,000 a month in spousal support and $111.92 a month in child support. The trial court noted the difficulty of determining Husband's income and, at Wife's request, appointed a forensic accountant to evaluate Husband's finances. In April 2009, the court acknowledged that it used an incorrect income figure from Husband's financial affidavit when ordering temporary support, but the court declined to modify the amount of support ordered.

{¶6} The forensic accountant testified that he was unable to reach any conclusions about Husband's finances because he was unable to obtain many of the requested documents. The accountant said that he saw several "red flags" which included (1) "significant transfers of assets," (2) "[l]oans going back and forth between the owners in the corporation," and (3) "transfers of real estate between family members."

{¶7} After lengthy discovery, the case proceeded to trial on September 12, 2011, December 21, 2011, and February 2, 2012. The court granted the divorce on August 2, 2012, and ordered Husband to pay $589.25 a month in child support and $1,000 a month in spousal

support for thirty-six months, giving Husband credit for twelve months of support payments under the temporary orders.

{¶8} Husband now appeals and raises four assignments of error for our review. Additionally, Wife cross-appeals and raises two assignment of error.

II

Husband's Assignment of Error Number One

THE DECISION OF THE TRIAL COURT FINDING THE PARTIES FILED FOR BANKRUPTCY PROTECTION RESULTED IN AN INEQUITABLE DISTRIBUTION OF PROPERTY THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY ALLOCATING APPELLANT ALL MARITAL DEBT.

{¶9} In his first assignment of error, Husband argues that the property division is inequitable because the court incorrectly found the parties had discharged all credit card debt. Because the court made an erroneous factual finding, we reverse.

{¶10} R.C. 3105.171(C)(1) requires the court to divide marital property equally. However, "[i]f an equal division of marital property would be inequitable, the court shall * * * divide it between the spouses in the manner the court determines is equitable." R.C. 3105.171(C)(1). In determining an equitable distribution, "the court shall consider all relevant factors, including those set forth in [R.C. 3105.171(F)]." *Id*.

{¶11} "Although the allocation of debt is not specifically addressed in the statute, the division of property also includes martial debt." *Kokoski v. Kokoski*, 9th Dist. Lorain No. 12CA010202, 2013-Ohio-3567, ¶ 4, quoting *Smith v. Smith*, 9th Dist. Summit No. 26013, 2012-Ohio-1716, ¶ 8. "A trial court's division of marital debt is reviewed for an abuse of discretion." *Smith*, 2012-Ohio-1716, at ¶ 8. An abuse of discretion indicates that the trial court's decision

was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶12} Husband, in his written closing argument, asserted that "[t]he parties' credit card debt alone amounts to over $77,000 [and that] $58,000 of the parties' credit card debt was incurred prior to the start of this divorce action." However, Husband also testified that he withdrew $29,000 from his Discover and MasterCard accounts to use as part of the payment for a residential property in Arizona. Wife signed a disclaimer deed for the Arizona property. While the record includes balances of various credit cards, it is unclear what amount, if any, is marital debt and what amount is attributable to Husband's convoluted business dealings.

{¶13} Regardless, the trial court found that "the parties filed an action in bankruptcy and discharged all credit card debt." However, there is no evidence that the parties filed bankruptcy or that any of the credit card debt has been discharged. Because this finding is not supported by the record, we must reverse and remand for the trial court to determine what credit card debt is marital debt and how it should be distributed among the parties. *See* R.C. 3105.171(C)(1)/(F).

{¶14} Accordingly, Husband's first assignment of error is sustained.

Husband's Assignment of Error Number Two

THE DECISION OF THE TRIAL COURT IN DETERMINING APPELLANT'S INCOME WITHOUT CONSIDERATION OF THE MARITAL DEBT RESULTED IN AN INEQUITABLE DETERMINATION OF THE AMOUNT OF SPOUSAL SUPPORT AND CHILD SUPPORT THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

Husband's Assignment of Error Number Three

THE DECISION OF THE TRIAL COURT IN DETERMINING THE TERM OF SPOUSAL SUPPORT TO BE PAID BY APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BASED ON THE TERM OF SUPPORT PAID UNDER THE TEMPORARY ORDERS.

Wife's Assignment of Error Number One

THE TRIAL COURT ERRED IN ITS CALCULATION OF SPOUSAL SUPPORT WHEN IT FAILED TO FULLY REVIEW ALL OF THE STATUTORY FACTORS IN ITS DETERMINATION OF SPOUSAL SUPPORT[.]

{¶15} In his second and third assignments of error, Husband argues the court erred in its determination of spousal support. Additionally, Wife, in her first assignment of error, argues the court erred in its support order.

{¶16} In determining whether spousal support is appropriate and reasonable, the court must consider, among other factors, "[t]he relative assets and liabilities of the parties * * *." R.C. 3105.18(C)(1)(i). In light of our resolution of Husband's first assignment of error these issues are not yet ripe for review and we decline to address them.

Wife's Assignment of Error Number Two

THE TRIAL COURT ERRED IN ITS DISTRIBUTION OF PROPERTY WHEN IT FAILED TO ACCOUNT FOR THE HUSBAND'S INTEREST IN PROPERTY LOCATED IN ARIZONA, OTHER CLAIMED PROPERTIES, AND PROMISSORY NOTES[.]

{¶17} In her second assignment of error, Wife argues that the court erred in not considering certain property in its distribution order. Specifically, Wife argues that the court erred by not considering Husband's interest in: (1) the Arizona property, (2) the rental properties deducted on his tax returns, and (3) the promissory notes from Braidy Jewelers.

{¶18} The trial court found that "the parties * * * were, in fact, the equitable owners of [] various residences including the Ido Avenue property." The court proceeded to evenly divide the sales proceeds from the Ido Avenue property between Husband and Wife. We note that Husband did not file an appellee's brief in response to Wife's cross-appeal nor did he appeal the court's finding that the parties were equitable owners of various residences. Because the case must be remanded for the court to reconsider the property distribution, Wife's argument is not

ripe for review. However, the court should clarify in its new distribution order what value it has attributed to the various residences.

{¶19} Additionally, the trial court found that one promissory note "to [Husband] in the sum of $10,000 (Exhibit M)" was marital property and subject to distribution. We note that the promissory note referenced has a face value of $10,800. On remand, the court should detail any deduction it might have made from the note.

{¶20} In light of our resolution of Husband's first assignment of error, Wife's second assignment of error is not ripe for review and we decline to address it.

<u>Husband's Assignment of Error Number Four</u>

THE TRIAL COURT ERRED IN FINDING THE PROPOSED SHARED PARENTING PLAN WAS IN THE BEST INTEREST OF THE CHILDREN AND SUCH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} In his fourth assignment of error, Husband argues that the court erred in finding Wife's proposed shared parenting plan was in the best interest of the children. Specifically, Husband argues the court erred in failing to "more closely consider[] the children's interrelationships with [him]."

{¶22} A trial court's decision to adopt a shared parenting plan is reviewed under an abuse of discretion standard. *Haas v. Bauer*, 156 Ohio App.3d 26, 2004-Ohio-437, ¶ 20 (9th Dist.). An abuse of discretion indicates that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. Before adopting a shared parenting plan, the court must determine that it is in the best interest of the children. *See* R.C. 3109.04. In determining the best interest of a child, the court "shall consider all relevant factors," including, those enumerated in R.C. 3109.04(F). R.C. 3109.04(F).

**{¶23}** On March 19, 2009, the court entered a temporary parenting plan. According to this plan, both parties were the residential parent and legal custodian of the children. Husband was granted parenting time every other weekend and every Tuesday from 4:00 p.m. until Wednesday at 7:00 p.m. In October 2009, Husband filed a proposed parenting plan in which the parties would alternate parenting time weekly. At the December 21, 2011 hearing, Husband testified that while the children had gotten used to the temporary parenting plan schedule because they had been following it for three years, they were all "still having a hard time with it." Husband requested some changes to "streamline the pick up and drop off." In particular, Husband wanted parenting time every Tuesday from 3:00 p.m. (right after school) until Thursday at 8:30 a.m. (when he would drop them off at school). The court instructed Husband's counsel to file a shared parenting plan outlining the details. No such plan was filed.

**{¶24}** At trial, Pamela Cibik, a Clinical Counselor with Child Guidance Family Solutions, testified. Cibik had been counseling the Braidy children every other week for the past two years. Cibik explained that M.B., the oldest child, had begun counseling to address anger issues surrounding the divorce. According to Cibik, M.B. and R.B., the middle child, had expressed an interest in spending more time with Husband. Cibik testified that Husband always brought the children to the counseling session and would stay for half of each session. Cibik said that she had little interaction with Wife and was not testifying to make any recommendations to the court. Cibik explained that her job was merely to help the children develop coping skills.

**{¶25}** Wife testified that the children were originally seeing a counselor at Catholic Social Services, but that Husband had changed counselors without her knowledge or consent. Wife explained that it took her six months to get any information on their new counselor.

**{¶26}** Carol Miller was appointed as a guardian ad litem in March 2009. Miller agreed that Wife had complained to her that she was being "shut out" of the children's counseling sessions with Cibik. Miller said she encouraged Wife to call Cibik back and attempt to get an appointment scheduled. However, Miller also testified that she was surprised to hear at trial that only Husband had been involved in the counseling sessions with Cibik.

**{¶27}** Miller testified that there is a lack of communication between Husband and Wife and the children feel caught in the middle. According to Miller, she did not see any problem with the current parenting schedule, but she thought that Husband should have more time with the children. Miller opined that "something approaching [a] 50% time split is not unrealistic or unreasonable."

**{¶28}** Wife testified that the parties were still following the temporary parenting plan, which, at that point, had been in place for the past three years. Wife testified that there is no communication between her and Husband regarding the children and she expressed concerns about Husband enrolling the children in extracurricular activities that interfere with her parenting time. Despite the communication troubles, Wife explained that everyone had gotten used to the temporary parenting schedule and that it was working well for everyone. Wife requested that the court keep the schedule the same.

**{¶29}** The court found that "the schedule outlined in [Wife's] Shared Parenting Plan [had] been followed by the parties during the pendency of [the divorce] and [that Wife] testified that the Plan was working well." At the time of the judgment entry, the parties had been following this parenting plan for almost four years. While Husband did request additional time and the GAL recommended more parenting time for Husband, there was no testimony that the current schedule was a problem. There is evidence in the record that the parties are having

difficulty communicating with one another and that the oldest child was having difficulty coping with the divorce. After reviewing the record, we cannot conclude that it was an abuse of discretion for the court to keep the same parenting schedule that had been working for the parties for the past four years.

{¶30} Husband's fourth assignment of error is overruled.

### III

{¶31} Husband's first assignment of error is sustained. His fourth assignment of error is overruled. Husband's second and third, and Wife's assignments of error are not yet ripe for review. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

———————————————————

BETH WHITMORE
FOR THE COURT


HENSAL, J.
<u>CONCURS.</u>

BELFANCE, P. J.
<u>CONCURRING IN JUDGMENT ONLY.</u>

{¶32} Our legal system is predicated upon the principle that after full disclosure by all parties, the trier of fact will objectively assess the facts and reach a fair and just result. Full disclosure is all the more essential with courts of equity such as the domestic relations court. I write separately to note that the record in this case is very troubling as it reflects that full disclosure was absent and thus, the trial court was faced with the unenviable task of attempting to achieve a just result with an incomplete understanding of the parties' finances.

{¶33} Husband is a principal co-owner of a family jewelry business and has been in business for 20 years. While Husband and Wife were married, they lived in Fairlawn Heights, an affluent community, until marital acrimony developed. The parties lived a very comfortable lifestyle and the children have attended private schools. Wife described living in a "fancy house" and that the lifestyle was "high." Wife was not permitted to know any details of the business. She stated that "if for some reason they're talking about business issues and I get into the kitchen everybody will just change the subject." She also stated that Husband kept financial materials such as tax returns in his car and would take them briefly into the home for her to sign. She was not permitted to review the returns.

{¶34} At the outset of the litigation, Wife's counsel sought discovery and the requests were repeated and ongoing. Ultimately, Mr. Dunkle, a forensic accountant, was retained in an attempt to determine cash flow and whether there was evidence of hiding or misappropriating funds. The most basic financial information was not provided based on representations that no documents were in Husband's possession or the corporation's possession. Mr. Dunkle stated that it was highly unusual for a corporation not to retain basic documents, such as bank statements for 7 years. Mr. Dunkle also testified that his "success rate [in obtaining requested documentation] was among the worst [he had] ever experienced" and he got only "piecemeal" information. In the meantime, Wife, who, had no independent source of income and was not receiving court-ordered support because Husband unilaterally stopped paying it, had no funds to chase down the documents necessary to fully evaluate the financial dealings. By trial, Wife was receiving food stamps and WIC benefits for the children. Given the lack of information, Mr. Dunkle was unable to reach any definitive conclusions about the financial dealings.

{¶35} According to Mr. Dunkle, the materials he did review raised many "red flags" that needed to be explored, including among others, significant asset transfers between family members. In other words, both the personal and corporate financial documents raised many more questions that were left unanswered. Mr. Dunkle described the problematic nature of the personal tax returns. The parties were supposedly living on minimal, poverty-level income, yet somehow they were driving two vehicles (a Yukon and a Cadillac) and supporting three children. For example, Mr. Dunkle noted Husband's claimed income was $8,247, yet one-third of that income was given in charitable contributions. Mr. Dunkle stated "[s]o I found it unusual that someone with a wife and three kids, he was only making $8,247 would give $29% of that away to charity." In addition, Husband and his brother reported a huge drop in income coinciding

right at the time they both filed for divorce. Further, Mr. Dunkle testified that there were tens of thousands of dollars in unexplained deposits showing in Husband's accounts. In 2008 alone, Dunkle could not account for $44,000 worth of deposits. Mr. Dunkle also stated that the transaction that occurred relative to the purchase of the residence in Arizona was unusual. The home was purchased for cash by Husband who, some months after, transferred title to his brother. Notwithstanding, Husband took mortgage interest deductions on this property despite the fact that he had no ownership of the property or obligation on the mortgage. Husband also did this with respect to three other properties in Ohio. At one point in the proceedings the trial court admonished Husband stating: "Be careful before you end up headed for jail. You better go talk to your lawyers. You better go talk to your lawyers about the IRS too."

{¶36} The trial court expressed its frustration over the lack of disclosure and noted that the same thing was occurring in Arizona where Husband's brother was divorcing his wife. The Arizona court ultimately could not place a value on the jewelry business due to lack of information. Similarly, in this case, the trial court never obtained a clear picture as to Husband's actual income or the parties' assets.

{¶37} The record further reflects Husband's cavalier attitude toward following court orders and the law. At the December 21, 2011 hearing, Husband admitted that he had not filed his 2010 federal tax return because he did not want his refund to be applied to any support arrearage. "I don't want to lose that money again. I believe that I have a right and my right is to get some money for myself. I worked hard for that." Shortly thereafter, at the same hearing, Husband admitted that he had stopped paying support despite the court order because he "believed that [he] ha[d] paid enough into the child support after three+ years of a seven year marriage." Husband testified that the company owed him $87,908 at the time of the divorce.

However, without court authority, the corporation was paying down this note and the funds from the note were used to pay support, contrary to the standing order of the court prohibiting any dissipation of assets. Husband also did not disclose his interest in the note payable or the other real estate on his financial affidavit and was questioned about having omitted disclosure of his ownership of property in a prior divorce.

{¶38} Turning to Husband's first assignment of error, while I agree that the court committed a technical error in finding that the parties had discharged their credit card debts in bankruptcy it would appear that the error is harmless. It is unclear how the error affected the outcome of the proceedings, given that even without the incorrect finding it would not be an abuse of discretion to allocate the debt to Husband under the circumstances. A review of the record shows that it is entirely possible that this credit card debt is solely attributable to Husband. Husband testified that he had "just a minimal amount" of credit card debt when he withdrew $29,000 from two credit cards to use toward the down payment on the Arizona house. Husband explained that he had planned "all along" to use those funds to open the Jewelry store in Arizona. Notably, Husband also testified that money had been saved in anticipation of opening the Arizona jewelry store and the Chapel Hill inventory was going to be used in the Arizona store. In any event, Husband co-mingled business and personal funds. In light of Husband's poor financial recordkeeping, it is entirely reasonable for the court to conclude that these debts are business-related and not martial debts. However, I agree that a remand is appropriate to achieve clarity in the judgment as to the allocation of the debts so as to avoid potential noncompliance with the court's judgment.

{¶39} As to the various rental properties, I agree that the court should clarify equitable ownership in the other properties given its finding that the parties were equitable owners of various residences. Accordingly, I concur.

APPEARANCES:

CORRINE HOOVER SIX, Attorney at Law, for Appellant/Cross-Appellee.

GARY M. ROSEN, Attorney at Law, for Appellee/Cross-Appellant.